UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:17-CV-23933-UNGARO-O'SULLIVAN

JONES REAL ESTATE, INC. d/b/a
JONES REALTY, individually and on
behalf of all others similarly situated,

      Plaintiff,

             v.

AMERICAN BANKERS INSURANCE
COMPANY OF FLORIDA, *et al.*,

      Defendants.

_____/

**DEFENDANT AMERICAN BANKERS INSURANCE
COMPANY OF FLORIDA'S MOTION TO DISMISS
COUNTS III AND V OF THE CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

MOTION TO DISMISS AND REQUEST FOR HEARING ........................................................1

PRELIMINARY STATEMENT ...........................................................................................1

THE COMPLAINT'S ALLEGATIONS ..................................................................................3

ARGUMENT ................................................................................................................5

    I.     Missouri Law Governs The Unjust Enrichment And Tortious Interference Claims ....................................................................................5

    II.    The Complaint Fails To State An Unjust Enrichment Claim ................................6

        A.    American Bankers Did Not Receive Or Retain A Benefit From Jones Realty .........................................................................................7

        B.    Any Enrichment Was Not Unjust ...............................................................7

        C.    Missouri's Voluntary Payment Doctrine Bars The Claim........................12

    III.   The Complaint Also Fails To State A Tortious Interference Claim ....................14

        A.    American Bankers Did Not Act To Specifically Harm Jones Realty .........................................................................................14

        B.    The Purported Interference Was Justified And Not Tortious ...................16

        C.    The Lease Agreement Was Not Breached ................................................17

    IV.   The Complaint Is An Egregious Example Of "Shotgun Pleading" ......................18

CONCLUSION ...........................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*Ali v. Wells Fargo Bank, N.A.*,
   No. 13-876, 2014 WL 345243 (W.D. Okla. Jan. 24, 2014) ...................................................11

*Anapoell v. American Express Business Finance Corp.*,
   No. 08-4114, 2009 WL 766532 (10th Cir. Mar. 24, 2009) ...............................................9, 10

*Anapoell v. American Express Business Finance Corp.*,
   No. 07-198, 2008 WL 2225849 (D. Utah May 28, 2008) ................................................9, 10

*Anapoell v. American Express Business Finance Corp.*,
   No. 07-198, 2007 WL 4270548 (D. Utah Nov. 30, 2007) ......................................................9

*Anderson v. Bourbeuse View, Inc.*,
   726 S.W.2d 873 (Mo. Ct. App. 1987) ...................................................................................16

*Arnold v. AT&T, Inc.*,
   No. 10-2429, 2012 WL 1441417 (E.D. Mo. Apr. 26, 2012) ...............................................12

*Bishop v. Florida Specialty Paint Co.*,
   389 So. 2d 999 (Fla. 1980) ....................................................................................................6

*Blair v. City of Hannibal*,
   179 F. Supp. 3d 901 (E.D. Mo. 2016) .................................................................................12

*Cohen v. American Security Insurance Co.*,
   735 F.3d 601 (7th Cir. 2013) ........................................................................................8, 11, 17

*Community Title Co. v. Roosevelt Federal Savings & Loan Association*,
   796 S.W.2d 369 (Mo. 1990) ...........................................................................................16, 17

*Cooper v. Meridian Yachts, Ltd.*,
   575 F.3d 1151 (11th Cir. 2009) ..............................................................................................5

*Emerson Elec. Co. v. Marsh & McLennan Cos.*,
   362 S.W.3d 7 (Mo. 2012) .................................................................................................8, 17

*Feaz v. Wells Fargo Bank, N.A.*,
   745 F.3d 1098 (11th Cir. 2014) .......................................................................................8, 17

*Financial Security Assurance, Inc. v. Stephens, Inc.*,
   500 F.3d 1276 (11th Cir. 2007) ..............................................................................................2

*Fioretti v. Massachusetts General Life Insurance Co.*,
   53 F.3d 1228 (11th Cir. 1995) ................................................................................................5

*Franklin v. Harris*,
   762 S.W.2d 847 (Mo. Ct. App. 1989) ..................................................................................15

*Goldblatt v. Herron*,
   No. 09-0748, 2010 WL 11509058 (W.D. Mo. June 8, 2010) ..............................................12

*Herssein Law Group v. Reed Elsevier, Inc.*,
   594 F. App'x 606 (11th Cir. 2015) .......................................................................................19

*Howard v. Turnbull,*
  316 S.W.3d 431 (Mo. Ct. App. 2010) ...........................................................................7, 12

*Howard v. Youngman,*
  81 S.W.3d 101 (Mo. Ct. App. 2002) ...................................................................................14

*Joe Hand Promotions, Inc. v. Creative Entertainment, LLC,*
  978 F. Supp. 2d 1236 (M.D. Fla. 2013) ............................................................................18

*Joseph v. Bernstein,*
  612 F. App'x 551 (11th Cir. 2015).......................................................................................18

*Jurgensmeyer v. Boone Hospital Center,*
  727 S.W.2d 441 (Mo. Ct. App. 1987) .................................................................................12

*Karhu v. Vital Pharmaceuticals, Inc.,*
  No. 13-60768, 2014 WL 815253 (S.D. Fla. Mar. 3, 2014) ..................................................5

*Kaufman v. Pfizer Pharmaceuticls, Inc.,*
  No. 02-22692, 2010 WL 9438673 (S.D. Fla. Nov. 23, 2010)..............................................18

*Langford v. Rite Aid of Alabama, Inc.,*
  231 F.3d 1308 (11th Cir. 2000)...........................................................................................13

*Matter of Chrome Plate, Inc.,*
  614 F.2d 990 (5th Cir. 1980)...............................................................................................19

*McFadden, Lyon & Rouse, LLC v. CIT Communications Finance Corp.,*
  224 So. 3d 155 (Ala. 2015) ................................................................................................10

*McFadden, Lyon & Rouse, LLC v. Avaya Finance Corp.,*
  No. 03-2072, 2015 WL 13639342 (Ala. Cir. Ct. Jan. 30, 2015)...................................10, 14

*Minnesota Mining & Manufacturing Co. v. Williamson,*
  675 S.W.2d 951 (Mo. Ct. App. 1984) .................................................................................16

*Morris v. Green Tree Servicing, LLC,*
  No. 14-1998, 2015 WL 4113212 (D. Nev. July 8, 2015)....................................................11

*In re NationsRent Rental Fee Litigation,*
  No. 06-60924, 2009 WL 636188 (S.D. Fla. Feb. 24, 2009)..................................................6

*Nazeri v. Missouri Valley College,*
  860 S.W.2d 303 (Mo. 1993)................................................................................................17

*Northern Farms, Inc. v. Jenkins,*
  472 S.W.3d 617 (Mo. Ct. App. 2015) .................................................................................12

*Paylor v. Hartford Fire Insurance Co.,*
  748 F.3d 1117 (11th Cir. 2014)...........................................................................................19

*Porch v. General Motors Acceptance Corp.,*
  642 N.W.2d 473 (Minn. Ct. App. 2002) ........................................................................10, 11

*Riley v. Home Retention Services, Inc.,*
  No. 14-20106, 2014 WL 11906642 (S.D. Fla. June 17, 2014) .......................................18, 19

*Schott v. Beussink*,
   950 S.W.2d 621 (Mo. Ct. App. 1997) ...................................................................16

*Sekula v. Residential Credit Solutions, Inc.*,
   No. 15-2104, 2016 WL 6650712 (M.D. Fla. Nov. 10, 2016) .................................15

*Southeastern Integrated Medical, P.L. v. North Florida Women's Physicians, P.A.*,
   50 So. 3d 21 (Fla. Dist. Ct. App. 2010)................................................................16

*Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*,
   305 F.3d 1293 (11th Cir. 2002).............................................................................18

*Trumpet Vine Investments, N.V. v. Union Capital Partners I, Inc.*,
   92 F.3d 1110 (11th Cir. 1996)..............................................................................5, 6

*United States v. Varner*,
   13 F.3d 1503 (11th Cir. 1994)..................................................................................2

*Weiland v. Palm Beach County Sheriff's Office*,
   792 F.3d 1313 (11th Cir. 2015).............................................................................18

**Rules**

Fed. R. Civ. P. 19 .........................................................................................................1

Fed. R. Evid. 902 .........................................................................................................2

**Miscellaneous**

Restatement (Second) of Conflict of Laws § 145 (1971) .............................................6

Restatement (Second) of Conflict of Laws § 156 (1971) .............................................6

Restatement (Second) of Torts § 766 (1979)..............................................................15

**MOTION TO DISMISS AND REQUEST FOR HEARING**

Defendant American Bankers Insurance Company of Florida ("American Bankers") hereby moves this Court to dismiss Counts III and V from the Class Action Complaint for failure to state a claim upon which relief can be granted, and requests a one-hour hearing on its motion.

**PRELIMINARY STATEMENT**

This lawsuit was brought on behalf of commercial lessees which have incurred monthly charges for property insurance issued by American Bankers and related administrative services performed by affiliates of defendant CIT Group, Inc.  Plaintiff Jones Real Estate, Inc. d/b/a Jones Realty ("Jones Realty") purports to represent two putative nationwide classes and two putative Missouri-only classes composed of these lessees.

The property insurance at issue protects equipment leased or financed by nonparty CIT Bank, N.A. ("CIT")[1] or defendant Avatel Technologies, Inc. ("Avatel"), is authorized by written lease agreements, and is detailed in correspondence and brochures sent to lessees like Jones Realty.  In particular, the lease agreements, correspondence, and brochures explain that the lessees must insure the equipment against loss, theft, or damage, naming CIT as the loss payee. Lessees may satisfy this requirement either by participating in an insurance program arranged by CIT or, if they elect to do so, by obtaining acceptable alternative coverage from an insurer of the lessees' own choosing.  Per the lease agreement, the costs of acquiring and maintaining insurance under the CIT-arranged option are added to any amounts due under the agreement. The lease agreements, correspondence, and brochures explain that these costs may exceed the cost of insurance that lessees might obtain on their own and disclose, to the penny, the monthly charges that will be incurred.  And these documents disclose, repeatedly, that CIT or its affiliates might receive a financial benefit if the lessees elect to participate in the CIT insurance program.

All this contractual authorization and disclosure notwithstanding, Jones Realty professes surprise that CIT receives financial benefits from American Bankers in connection with the insurance, which benefits supposedly "inflate" the monthly charges so that they exceed the cost of insurance that Jones Realty could have obtained on its own.  Jones Realty characterizes these benefits as "kickbacks."  It also complains that the insurance is "backdated" to cover periods during which no claims were made, and that the insurance has broader coverage than what is

---

[1] The Complaint does not plead, as it must, why CIT is not joined.  *See* Fed. R. Civ. P. 19(c).

required to protect CIT's interest.  Fueled by these allegations, Jones Realty asserts common-law claims against American Bankers and its grandparent holding company, Assurant, Inc., for unjust enrichment (Count III) and tortious interference with a business relationship (Count V).

Both claims are facially defective and should be dismissed with prejudice.  The unjust enrichment claim fails for a variety of reasons.  First, American Bankers is not alleged to have received any benefit from Jones Realty, but is instead only alleged to have paid to CIT the same "inflated" portion of the charge that Jones Realty is attempting to recover.  Second, there is nothing unjust about the "kickback," "backdating," or "overbroad coverage" theories advanced. Labeling defendants' financial arrangements "kickbacks" does not make them so.  Moreover, the Lease Agreement at issue – which Jones Realty is careful to neither quote in nor attach to its Complaint[2] – permits CIT to charge for the "costs of acquiring and maintaining insurance," not the "costs" net of any financial benefits paid to CIT.  The lease agreement further authorizes continuous coverage on the leased equipment, and for an amount deemed acceptable to CIT. Third, Jones Realty has voluntarily paid the monthly charges with full knowledge of the salient facts.  Having been paid voluntarily, those charges cannot now be judicially recovered.

The tortious interference claim also fails.  The Complaint does not allege a specific intent by American Bankers to harm Jones Realty, only a generalized intent to profit from a contractual relationship with CIT that long preexisted CIT's relationship with Jones Realty.  In addition, American Bankers was legally privileged to protect its economic interests in that preexisting relationship, and nothing about its supposed "interference" was "tortious."  Finally, there was never a contractual breach anyway on which to predicate this tort claim.

---

[2] Jones Realty has good reason to not attach the Lease Agreement – it contradicts the claims asserted.  A redacted copy of the Lease Agreement is attached as Exhibit A to this motion to dismiss.  The Court may consider this document in deciding the motion without converting it to one for summary judgment.  Extra-complaint documents may be considered "in cases in which a plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss."  *Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007).  The Lease Agreement is unquestionably "central" to Jones Realty's claims, including its claims for unjust enrichment, *see* ECF No. 1 ¶ 77, and tortious interference, *see id.* ¶¶ 96-99, and is referenced repeatedly in the Complaint.  Moreover, the Lease Agreement, which bears the signature of Jones Realty's "Office Manager," is self-authenticating commercial paper, including under Article 2A of the Uniform Commercial Code, which has been adopted in Missouri, Florida, and New York.  *See* Fed. R. Evid. 902(9); *United States v. Varner*, 13 F.3d 1503, 1510 (11th Cir. 1994).

## THE COMPLAINT'S ALLEGATIONS

"Jones Realty is a Missouri business wh[ich] signed up with Avatel Technologies, Inc. to provide telephones and telephone service."  ECF No. 1 ¶ 32.  In this regard, Jones Realty became the commercial lessee under a two-page Lease Agreement with nonparty CIT Bank, N.A. (again, "CIT") dated October 13, 2016, naming Avatel as the "Supplier."  The Agreement's first page requires Jones Realty "to provide and maintain insurance related to the Equipment," and refers to Section 6 of the Agreement.  In turn, Section 6 provides, in pertinent part:

> 6.  INSURANCE.  You [Jones Realty] will provide and maintain at your expense … property insurance against the loss, theft or destruction of, or damage to, the Equipment for its full replacement value, naming us [CIT] as loss payee….  You will give us certificates or other evidence of such insurance when requested.  Such insurance will be in a form, amount and with companies acceptable to us, and will provide that we will be given 30 days advance notice of any cancellation or material change of such insurance.  If you do not give us evidence of insurance acceptable to us, we have the right, but not the obligation, to obtain insurance covering our interest in the Equipment for the term of this Lease, including any renewals or extensions, from an insurer of our choice, including an insurer that is our affiliate.  We may add the costs of acquiring and maintaining such insurance and our fees for our services in placing and maintaining such insurance (collectively, "Insurance Charge") to the amounts due from you under this Lease.  You will pay the Insurance Charge in equal installments allocated to the remaining Lease Payments.  If we purchase insurance, you will cooperate with our insurance agent with respect to the placement of insurance and the processing of claims.  Nothing in this Lease will create an insurance relationship of any type between us and any other person.

Correspondence entitled (in large, bold letters) "**Important Property Insurance Notice**" was sent one week later.  ECF No. 1 Ex. A.  This correspondence reminded Jones Realty of the Lease Agreement's insurance requirement and explained the two options available to satisfy that requirement: "You can satisfy this requirement either by electing to participate in an insurance program that we have arranged or by obtaining your own insurance coverage."  *Id.*

"Option 1" was to "Insure Equipment Under The Property Insurance Program That We Have Arranged."  *Id.*  The correspondence stated that the "Benefits of this program" are:

- Broad coverage – in addition to fire, theft, and other causes of loss normally covered under a commercial property policy, this policy also covers flood, wind and hurricane and power surge.
- The insurance charge will not change over the term of your lease or loan agreement.
- No deductible – covered losses are paid without a deductible (losses under $100 are not covered).

3

- Convenient insurance charges – it's included in your invoice.
- The equipment is covered under the policy as of the date you elect to participate in the coverage by remitting payment as described below.

*Id.*

The correspondence also advised that "IF YOU ELECT THIS OPTION, THERE IS NOTHING MORE TO DO. We will add $19.58 to each of your invoices which includes the insurance charge and any administrative service fees." *Id.* "If satisfactory evidence of insurance is not received by our equipment insurance representative," it continued, "you will be deemed to have elected to participate in the insurance program we have arranged." *Id.* The correspondence disclosed that American Bankers would underwrite the insurance and that, if Jones Realty elected the default option, then CIT "or an affiliate may receive a financial benefit if you choose to have the equipment covered under the policy." *Id.*

The correspondence also outlined "Option 2," which allowed Jones Realty to "Use Your Own Insurance Carrier." *Id.* To have exercised that option, Jones Realty need only have had obtained adequate insurance and provided proof of coverage. *Id.* Under this option, the "Insured Value" need only have been $10,235, and the coverage need only "also include theft." *Id.*

Additional and repeated disclosures were made in an accompanying two-page brochure. *Id.* Among other things, the brochure describes, in detail, "Settlement of Covered Losses," "Rental Payments Covered," that "No Liability Insurance is Provided," "Loss Descriptions," "the Insurance Company," "Policy Limits and Deductibles," "Equipment Not Covered," "Exclusions," "Benefits of the Program," and other "Important Information." *Id.* For example, the brochure disclosed that "coverage on the equipment" would include "protection for several types of losses not available on many business policies, such as flood, earthquake and power surge." *Id.* The "Policy Limits and Deductibles" section disclosed that "[c]overed losses are paid from dollar one provided the loss is greater than $100. The maximum amount that will be paid is $250,000 per occurrence." *Id.* Notably, the brochure advised that the Insurance Charge "may be more than the cost of insurance you can buy on your own" and (again) reminded Jones Realty that CIT or its affiliates "may receive a financial benefit if you choose to have the equipment covered under our policy." *Id.*

Jones Realty admits that it did not provide proof of coverage, ECF No. 1 ¶ 33, and instead elected by default to participate in the CIT-arranged insurance program. Since that time, it has paid $19.58 each month in Insurance Charges. *Id.* ¶ 40. Jones Realty alleges, without

4

elaboration, that "[a] percentage of the premium was kicked back to CIT, Assurant, and/or an affiliate," *id.* ¶ 41, in the form of commissions "usually paid to an affiliate" or through "lucrative reinsurance arrangements" and other "unmerited charges." *Id.* ¶ 19. It offers no concrete or specific facts about the commissions, reinsurance, or other financial arrangements, including identifying which affiliates were involved or how the "kickbacks" were actually structured.

## ARGUMENT

## I. Missouri Law Governs The Unjust Enrichment And Tortious Interference Claims.

Missouri's substantive law governs Counts III and V. A Missouri resident, ECF No. 1 ¶ 8, Jones Realty purports to represent two putative Missouri-only classes, *id.* ¶ 45, suggesting Jones Realty's agreement with this choice of law.[3] Regardless of the parties' apparent consensus, however, established legal principles also support this choice. In determining which state's substantive law applies, a federal district court sitting in diversity jurisdiction applies the choice of law rules of the forum state. *Trumpet Vine Invs., N.V. v. Union Capital Partners I, Inc.*, 92 F.3d 1110, 1115 (11th Cir. 1996). Under Florida law, a court makes a separate choice of law determination with respect to each particular issue under consideration. *Id.*[4]

An unjust enrichment claim is one in the nature of quasi-contract. Florida's choice of law rule for such claims is that of *lex loci contractus*, which looks to where the quasi-contract was made. *Id.* at 1119-20. "A contract is made where the last act necessary to complete the contract is performed." *Id.* at 1119. Because Jones Realty paid the disputed Insurance Charges in Missouri, the last act necessary to complete the purported implied contract occurred in Missouri. For unjust enrichment claims, the place of contracting is generally considered to be the place of a product's purchase. *See Karhu v. Vital Pharms., Inc.*, No. 13-60768, 2014 WL 815253, at *9 (S.D. Fla. Mar. 3, 2014) (in lawsuit alleging that dietary supplement was ineffective for its

---

[3] Jones Realty nonetheless may advance the argument that either Florida (or New York) law applies. Applicable Missouri law, however, conflicts sharply with Florida law, as explained in footnote 7, *infra*. If the Court determines that "the laws of the competing states are substantially similar," then the Court must "decide the issue under the law of *each* of the interested states." *Fioretti v. Mass. Gen. Life Ins. Co.*, 53 F.3d 1228, 1234 (11th Cir. 1995) (emphasis added).

[4] The Lease Agreement's New York choice of law provision is immaterial – American Bankers is not a party to that Agreement. "A choice of law clause … is a contractual right that cannot ordinarily be invoked by or against a party who did not sign the contract in which the provision appears." *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1169 (11th Cir. 2009).

advertised purpose, applying unjust enrichment law of the state where the supplement was purchased); *In re NationsRent Rental Fee Litig.*, No. 06-60924, 2009 WL 636188, at *10 (S.D. Fla. Feb. 24, 2009) (in lawsuit alleging that plaintiff rented equipment from defendant and was charged allegedly illegal damage waiver fees and environmental charges, finding that "the law on unjust enrichment of each renter's particular state will be applied in resolving those claims").

Missouri law also governs the tortious interference claim. For tort claims, Florida courts follow the "most significant relationship" test set forth in the Restatement (Second) of Conflict of Laws § 145 (1971). *Trumpet Vine*, 92 F.3d at 1115-16. Under that test, contacts to be taken into account to determine the applicable law include: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." Restatement, *supra*, § 145(2). "These contacts are to be evaluated according to their relative importance with respect to the particular issue." *Id.* Although, in some cases, "the Restatement rule recognizes that the state where the injury occurred may have little actual significance for the cause of action," nonetheless "[t]he conflicts theory set out in the Restatement does not reject the 'place of injury' rule completely." *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980). "The state where the injury occurred would, under *most* circumstances, be the decisive consideration in determining the applicable choice of law." *Id.* (emphasis added).

Here, that "decisive consideration" points to Missouri. The place of injury is Missouri, where Jones Realty resides and has its principal place of business. ECF No. 1 ¶ 8. Missouri also is the place where the insured equipment is located, *id.* ¶ 32, and where members of the putative Missouri-only classes reside, *id.* ¶ 45. By contrast, defendants' respective states of residence are split between New York, Delaware, and Florida. *Id.* ¶¶ 9-12. Similarly, because no relationship is alleged to exist between Jones Realty and either American Bankers or Assurant, there is no place where the relationship is "centered." Because "[t]he applicable law will usually be the local law of the state where the injury occurred," Restatement, *supra*, § 156(2), and the alleged injury here occurred in Missouri, there is no reason to apply another state's tort law.

## II.    The Complaint Fails To State An Unjust Enrichment Claim.

Jones Realty's unjust enrichment claim fails. "To establish the elements of an unjust enrichment claim" under Missouri law, "the plaintiff must prove that (1) he conferred a benefit

on the defendant; (2) the defendant appreciated the benefit; and (3) the defendant accepted and retained the benefit under inequitable and/or unjust circumstances." *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo. Ct. App. 2010). "Even if a benefit is 'conferred' and 'appreciated,' if no injustice results from the defendant's retention of the benefit, then no cause of action for unjust enrichment will lie." *Id.* "Further, a *voluntary* payment, made under a mistake of law but not fact, cannot be recovered in an unjust enrichment claim." *Id.* at 437.

Jones Realty plausibly alleges neither the claim's essential elements, nor that its payments were made under a mistake of fact. As an initial matter, although American Bankers allegedly *paid* the "inflated" portion of the Insurance Charge that supposedly constitutes a "kickback," it is nowhere alleged to have *received* this benefit from Jones Realty. Next, the Lease Agreement's plain language expressly contradicts the novel constructions underlying the three theories that Jones Realty advances here – "kickbacks," "backdating," and "overbroad coverage." Any benefit American Bankers supposedly received was not retained under unjust or inequitable circumstances. And, regardless, because Jones Realty paid any Insurance Charges with full knowledge of the material facts, the voluntary payment doctrine bars the claim.

### A.      American Bankers Did Not Receive Or Retain A Benefit From Jones Realty.

The unjust enrichment claim initially fails because American Bankers is not alleged to have obtained the financial benefits of which Jones Realty was allegedly deprived, *viz.*, the "inflated" portion of the monthly Insurance Charge. The claim instead rests on the allegation that American Bankers overcharged CIT in the first instance so that it could later pay lessee-funded "kickbacks" to CIT that were not authorized by the Lease Agreement. *See* ECF No. 1 ¶¶ 19-23, 76-80. CIT supposedly passed the overcharge on to Jones Realty, which reimbursed CIT. *See id.*  ¶¶ 19-23. Even accepting Jones Realty's theory, American Bankers retained only the premium charged for the actual cost of insurance provided – any "inflated" or "excess" funds above and beyond that cost were necessarily paid to and retained by CIT. Recoverable benefits paid by Jones Realty, if any, thus flowed to CIT, not to American Bankers.

### B.      Any Enrichment Was Not Unjust.

Regardless, each of the three theories of "unjust enrichment" posited lacks merit.

***"Kickbacks."*** The "kickback" theory is implausible – defendants' financial arrangements cannot be fairly characterized as "kickbacks." In a case alleging the payment of "kickbacks" in the form of commissions for lender-placed insurance covering mortgaged residential property,

the Eleventh Circuit agreed "with the Seventh Circuit that 'simply calling a commission a kickback doesn't make it one.  The defining characteristic of a kickback is divided loyalties.  But the lender was not acting on behalf of the borrower or representing her interests.  The loan agreement makes it clear that the insurance requirement is for *the lender's* protection.'"  *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1111 (11th Cir. 2014) (quoting *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 611 (7th Cir. 2013)).  The Eleventh Circuit affirmed the dismissal of an unjust enrichment claim on that basis.  *Id.*  The same result should obtain here.  The insurance required by the Lease Agreement is exclusively for the protection of CIT, not Jones Realty.  *See* ECF No. 1 ¶ 5 (acknowledging that the insurance "is designed to protect the lender's interest in the equipment that secures the loan"); *see also* ECF No. 1 Ex. A ("You are not an insured, an additional insured, or a loss payee under this policy.").  There are no "divided loyalties" at issue.

Missouri law is in accord.  Under that state's common law, an insurance broker – which, unlike defendants here, actually owes insureds a duty of loyalty – nonetheless has: (1) no "duty to advise the insured on its insurance needs or on the availability of particular coverage, unless they specifically agree to do so," *Emerson Elec. Co. v. Marsh & McLennan Cos.*, 362 S.W.3d 7, 13 (Mo. 2012); (2) no "duty to obtain the lowest cost insurance that meets the insured's needs," *id.* at 14; and (3) no duty to disclose its receipt of contingent commissions from an insurer even if it "will be inclined to steer the insured to those insurers that will give it the biggest contingent commissions."  *Id.* at 19.  "Receipt of contingent commissions, therefore, is not a breach of a duty of loyalty."  *Id.*  If that is true for insurance brokers, then it must be all the more true for non-broker businesses in arm's-length equipment leasing transactions.  Because there are no loyalties to divide, what financial arrangements Jones Realty alleges are not "kickbacks."

Characterizations aside, it is neither "unjust" nor "inequitable" for American Bankers to pay financial benefits where, as here, the Lease Agreement authorizes CIT to receive them. Jones Realty posits, without textual support, that the Lease Agreement permitted defendants to charge only for the "actual 'cost'" of insurance, and that "kickbacks" embedded in the Insurance Charge were "beyond the actual 'cost' of force-placed insurance."  ECF No. 1 ¶ 62; *see also id.* ¶ 64.  That view is not supported by the Lease Agreement, which allows CIT to add, without qualification or limitation, "the costs of acquiring and maintaining such insurance and our fees for our services in placing and maintaining such insurance (collectively, 'Insurance Charge') to the amounts due from you under this Lease."  The Insurance Charge recoups the "costs" of

"acquiring" and "maintaining" the insurance, which includes such things as commission payments, reinsurance cessations, and a profit margin. The Lease Agreement permits CIT to charge to lessees the entire premium that CIT pays for the insurance, together with any administrative service fees, even if the premium and fees are supposedly "inflated" to include profits. *Id.* ¶ 5. And that is all defendants are alleged to have done here. *See id.* ¶¶ 22, 23.

Where contracting parties wish to define with greater precision the "costs" that might be assumed by one party, they can insert an adjective modifying the word "cost," such as "actual" or "reasonable." The Lease Agreement does not contain any such modifying language. It does not limit the Insurance Charge to defendants' "actual" effective cost or some hypothetical "reasonable" cost net of financial benefits that CIT received. Nor does the Lease Agreement limit the Insurance Charge to some profit-free premium computed based solely on American Bankers' loss experience. In short, defendants had no contractual or other duty to arrange for property insurance covering the leased equipment delivered at the lowest possible price.

This case is materially indistinguishable from *Anapoell v. American Express Business Finance Corp.*, another putative class action involving charges for property insurance covering leased equipment. No. 08-4114, 2009 WL 766532 (10th Cir. Mar. 24, 2009); No. 07-198, 2008 WL 2225849 (D. Utah May 28, 2008); No. 07-198, 2007 WL 4270548 (D. Utah Nov. 30, 2007). The lease agreement there provided that if the plaintiff-lessee (Dr. Anapoell) failed to obtain adequate insurance, then the defendant-lessor could "obtain such insurance at Lessee's expense." 2009 WL 766532, at *1. Dr. Anapoell sued, alleging that "the charges were more than Defendants' expense to obtain insurance coverage." *Id.* Among other reasons, he asserted, "the monthly charge includes amounts over the true insurance premium and reasonable expenses to obtain that insurance because Defendants (or their alter ego affiliates) receive payments from insurance agents or insurance companies under the guise of reinsurance cessations, service fees, commissions or rebates with no corresponding costs or risks." *Id.* at *2. The Tenth Circuit affirmed the district court's dismissal for failure to state a claim and adopted its reasoning. *Id.* at *4. "'Essentially, Dr. Anapoell interprets 'Lessee's Expense' to mean 'Lessor's Actual Cost and No More.' But Dr. Anapoell cannot and does not point to any express term in the Agreement to support his interpretation. Dr. Anapoell is reading language into the Agreement that does not exist, and he does not allege any course of dealing between the parties or usage of trade that would suggest the limitation he now advocates.'" *Id.* at *3 (quoting 2008 WL 2225849, at *4).

This imposed "'an unwritten requirement that the Defendants may only 'pass on' their actual insurance-related expenses to Dr. Anapoell.'"  *Id.* (quoting 2008 WL 2225849, at *6).

Other courts have similarly concluded that the contractual authorization for a creditor to charge for the "cost of the insurance" permits the creditor to charge the full premium that it pays to the insurance company for collateral protection insurance, notwithstanding the borrowers' allegation that the insurance "included coverages that were of no benefit to the borrowers and that the charge for the insurance was excessive."  *See Porch v. Gen. Motors Acceptance Corp.*, 642 N.W.2d 473, 476 (Minn. Ct. App. 2002).  The *Porch* court recognized that "the terms that authorize GMAC [the creditor] to charge the borrower for collateral-protection insurance are extremely broad, stating only 'the cost of the insurance.'  Without some limiting language in the installment contract, we find it difficult to disagree with GMAC's simplest argument, that the cost of the insurance is the amount GMAC pays for it – that is, the premium that [the insurer] charges and GMAC pays.  Clearly, the ordinary meaning of the word 'cost,' in the context of the purchase of insurance, is the premium," *id.* at 479, without "consider[ing] the reasonableness of the underlying costs reflected in that premium."  *Id.* at 480.

More recently, a court rejected the *same* theory in the *same* CIT insurance program, which ruling was summarily affirmed on appeal: "Plaintiff focuses on Defendants' efforts to maximize its profits while providing little or no benefit to the Plaintiff class.  There is no evidence that Defendants breached the express terms of the lease agreement, nor does Plaintiff prove that Defendants' conduct constituted legal fraud or was in violation of New Jersey statutory law."  *McFadden, Lyon & Rouse, LLC v. Avaya Fin. Corp.*, No. 03-2072, 2015 WL 13639342, at *1 (Ala. Cir. Ct. Jan. 30, 2015), *aff'd sub nom.*, *McFadden, Lyon & Rouse, LLC v. CIT Commc'ns Fin. Corp.*, 224 So. 3d 155 (Ala. 2015).  "Defendant placed the insurance on the equipment and set the price in accordance with the express terms of the lease."  *Id.* at *2.  "[T]he law does not impose on Defendants a general duty to act in good faith or altruistically in the establishment and administration of its lender placed insurance program."  *Id.* at *1.

*"**Backdating.**"*  The "backdating" theory is equally implausible.  The Lease Agreement requires that continuous coverage be in place "for the term of this Lease," without a single uninsured moment.  Insurance made effective, including retroactively, on the Lease Agreement's first day guarantees that there will be no discontinuity.

Jones Realty's assertion that the "backdated" insurance covers "periods during which no claims were made," ECF No. 1 ¶ 3, is meritless.  The Complaint does not allege that the equipment was undamaged, that Jones Realty informed defendants that there was no damage, or that defendants inspected the equipment to ascertain its status.  And what if damage occurred during the uninsured gap, but its effect is not apparent until later?  The Complaint does not say.  A claim could be made with respect to unknown damage.  Contrary to Jones Realty's intimation, therefore, so-called "backdated" insurance is both necessary and proper.

Unsurprisingly, many courts have dismissed at the pleadings stage "backdating" theories identical to Jones Realty's.  The Seventh Circuit, for example, eviscerated the theory:

> Schilke's contract claim is also premised on Wachovia's practice of backdating the lender-placed insurance to the date the borrower's policy lapsed.  Again, nothing in the loan agreement prohibits this.  Indeed, the loan agreement and related documents required Schilke to maintain *continuous* insurance coverage on her home, and reserved to the lender the right to do "whatever it deems reasonable or appropriate to protect the lender's rights in the property," including purchasing insurance if the borrower's own coverage lapses.  This broad language includes the purchase of backdated insurance, which is necessary to maintain continuous hazard coverage on the property.  Schilke alleges that the defendants backdated the replacement coverage when they "knew full well" that "no loss could have been claimed on the insurance policies."  This allegation is conclusory and unaccompanied by any factual content to make it plausible.  How could Wachovia or ASI know – either in Schilke's case or in the case of *any* particular borrower – whether or not a property loss had occurred during the lapse period?  Schilke doesn't say.

*Cohen*, 735 F.3d at 613.[5]

**"Overbroad Coverage."**  Jones Realty's alternative theory that "CIT required insurance in an amount that exceeded the value of the equipment leased or financed," *id.* ¶ 39, and had "broader coverage than what was required to protect the interest of the Defendant," *id.* ¶ 38, fails for similar reasons.  The Lease Agreement allows CIT to require insurance "in a form, amount and with companies acceptable to us [CIT]," without qualification or limitation, and further

---

[5] *See also Morris v. Green Tree Servicing, LLC*, No. 14-1998, 2015 WL 4113212, at *12 (D. Nev. July 8, 2015) (collecting cases); *Ali v. Wells Fargo Bank, N.A.*, No. 13-876, 2014 WL 345243, at *1 (W.D. Okla. Jan. 24, 2014) (collecting cases); *Porch*, 642 N.W.2d at 479 (holding that "'day-one coverage' is necessary if GMAC is to remedy the harm caused by a borrower's breach of the obligation to provide *continuous* coverage – without 'day-one coverage,' there would be an inevitable gap between the end of the borrower's insurance and the beginning of the replacement insurance").

required Jones Realty to supply "evidence of insurance acceptable to us [CIT]." If Jones Realty did not like the breadth, cost, or amount of the CIT-arranged option, then Jones Realty could have elected to obtain its own property insurance from another insurer for the "Insured Value" of $10,235, which coverage need only "also include theft," as stated in correspondence attached to the Complaint. ECF No. 1 Ex. A. Jones Realty, however, never elected this option.

### C. Missouri's Voluntary Payment Doctrine Bars The Claim.

The unjust enrichment claim also fails because Jones Realty paid all Insurance Charges with full knowledge of the salient facts. Under "well settled" Missouri law, where money is voluntarily paid with full knowledge of the facts it cannot be recovered. *Howard*, 316 S.W.3d at 439. "While a mistake of fact may affect the voluntariness of a payment, a mistake of law does not. Rather, a voluntary payment, made under a mistake of law but not fact, cannot be recovered in an unjust enrichment claim." *Id.* "The voluntary payment doctrine is a recognized defense to a claim for unjust enrichment," and regularly compels dismissal for failure to state a claim. *See Arnold v. AT&T, Inc.*, No. 10-2429, 2012 WL 1441417, at *9 (E.D. Mo. Apr. 26, 2012) (applying the Missouri voluntary payment doctrine to dismiss an unjust enrichment claim arising out of charges disclosed in the plaintiffs' telephone bills notwithstanding allegations that the charges were for products or services that the plaintiffs neither ordered nor authorized).[6]

The facts relevant to each theory asserted – "kickbacks," "backdating," and "overbroad coverage" – were disclosed to Jones Realty through the October 13, 2016 Lease Agreement, the October 20, 2016 correspondence, and its accompanying brochure. ECF No. 1 Ex. A.

*"Kickbacks."* Jones Realty was advised, twice, in the correspondence and brochure that CIT or its affiliates "may receive a financial benefit if you choose to have the equipment covered

---

[6] *See also Blair v. City of Hannibal*, 179 F. Supp. 3d 901, 913 (E.D. Mo. 2016) (dismissing unjust enrichment claim arising out of traffic-related fines disclosed in summons notwithstanding allegations that the fines were illegally imposed); *Goldblatt v. Herron*, No. 09-0748, 2010 WL 11509058, at *2 (W.D. Mo. June 8, 2010) (dismissing claim for money had and received where plaintiff voluntarily made mortgage payments notwithstanding that he was under no obligation to do so); *Jurgensmeyer v. Boone Hosp. Center*, 727 S.W.2d 441, 444 (Mo. Ct. App. 1987) (affirming dismissal of money had and received claim where plaintiff "pleads absolutely nothing (conclusory or concrete) alleging that he actually had to pay the money before the hospital would treat" his son, so plaintiff "was acting as a volunteer"). Under Missouri law, a claim for money had and received is functionally identical to a claim for unjust enrichment; indeed, the elements are the same. *See N. Farms, Inc. v. Jenkins*, 472 S.W.3d 617, 621 n.3 (Mo. Ct. App. 2015).

under our policy." Jones Realty admits having received these documents. *See* ECF No. 1 ¶¶ 35, 36. The "financial benefits" were part of the "costs of acquiring and maintaining such insurance and [CIT's] fees for [its] services in placing and maintaining such insurance," as disclosed in the Lease Agreement, which Jones Realty's "Office Manager" signed and dated. Jones Realty also was advised in the correspondence that the Insurance Charge "may be more than the cost of insurance you can buy on your own" and would be $19.58 per month. Nothing prevented Jones Realty from using this information to compare quotes in the open market. Based on a known higher cost to itself, and the knowledge that "financial benefits" could be paid to CIT, Jones Realty could have easily avoided paying the monthly Insurance Charge by obtaining its own insurance more than a dozen times since October 2016. Although it is an incorporated business and not an unsophisticated consumer, Jones Realty has never done so.

It does not matter that Jones Realty may not have known the *precise* details of the financial benefits allegedly paid to CIT. It is implausible (indeed, senseless) to suggest that a person who knew that the Insurance Charge was higher than what could be obtained elsewhere and yet did nothing to avoid that known higher cost would have bothered to act any differently had he or she known that the specific reason for the higher cost was the payment of commissions, reinsurance cessations, or some other particularized form of financial benefit. It was enough for Jones Realty to know that CIT or its affiliates "may receive a financial benefit" if it did not obtain property insurance from an alternative source. *See Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1314 (11th Cir. 2000) ("In an open market economy, consumers have the appropriate incentives to obtain information about acceptable cost of consumer goods, and to make purchases from the retailer who most closely matches that price. We do not expect retailers to disclose information about their pricing schemes – consumers are the actors who are best able to gather pricing information and put it to its highest and best use.").

*"Backdating."* Jones Realty also possessed the salient facts regarding its "backdating" claim. The Lease Agreement reserved CIT's right "to obtain insurance covering [its] interest in the Equipment for the term of this Lease, including any renewals or extensions," from an insurer of CIT's choice. The "term of this Lease" includes its first day continuing, uninterrupted, through its last day. Nowhere did defendants suggest that insurance would not cover periods for which no claim was yet made, nor would a rational insurer or insured ever suggest this.

***"Overbroad Coverage."***  It is perhaps most obvious that the voluntary payment doctrine bars Jones Realty's theory that the insurance provided "broader coverage than what was required," ECF No. 1 ¶ 38, and "exceeded the value of the equipment leased or financed," *id.* ¶ 39.  The scope and terms of coverage, and the coverage value required, were detailed in the October 20, 2016 correspondence and its accompanying brochure.  *Compare id.* ¶ 38(a)-(d) (alleging "broader coverage … in the following respects") *with* ECF No. 1 Ex. A (stating, verbatim, the very items described in Complaint subparagraphs 38(a)-(d)), *and id.* ("Covered losses are paid from dollar one provided the loss is greater than $100.  The maximum amount that will be paid is $250,000 per occurrence.").  Jones Realty knew from the outset *exactly* what coverages it would be paying for.  It never protested doing so until it filed the Complaint.

The voluntary payment doctrine thus bars the entire unjust enrichment claim.  "Plaintiff had a number of opportunities to prevent the assessment of the insurance charges.  The contract, in clear language, gave the Plaintiff the opportunity to provide its own insurance for the equipment."  *McFadden, Lyon*, 2015 WL 13639342, at *3.  "Defendants did not have unbridled discretion in the placement of the insurance.  Indeed Plaintiff retained ultimate control on whether a premium would be added at all.  Plaintiff failed to exercise that control."  *Id.*

## III.   The Complaint Also Fails To State A Tortious Interference Claim.

Jones Realty's claim for tortious interference with a business relationship also fails.  The "business relationship" at issue here is the Lease Agreement, a written contract.  ECF No. 1 ¶ 96.  "The elements of a claim of tortious interference with contract" under Missouri law "are: (1) a contract; (2) defendant's knowledge of the contract; (3) intentional interference by the defendant inducing or causing a breach of the contract; (4) absence of justification; and (5) damages resulting from defendant's conduct."  *Howard v. Youngman*, 81 S.W.3d 101, 112-13 (Mo. Ct. App. 2002).  "In analyzing the elements of this tort, Missouri courts have been guided by the Restatement (Second) Torts, Sections 766-774."  *Id.* at 113.

As a matter of law, Jones Realty cannot establish the third (intent) and fourth (justification) elements of this claim.  Nor can Jones Realty establish a contractual breach.

### A.   American Bankers Did Not Act To Specifically Harm Jones Realty.

The Complaint conclusorily alleges that American Bankers "intentionally and unjustifiably interfered" with Jones Realty's rights under the Lease Agreement by "entering into an exclusive relationship" with CIT ("and/or" Avatel) wherein American Bankers agreed to

"provide compensation" – what Jones Realty labels "kickbacks" – "in exchange for the exclusive right to force-place excessive and unnecessary premiums which are purposefully and knowingly charged to Plaintiff and the Classes." ECF No. 1 ¶ 98. Supposedly, defendants' preexisting agreements made it impossible for CIT to also comply with the Lease Agreement, resulting in charges for "bad faith, exorbitant and illegal charges for force-placed insurance in contravention of [Jones Realty's] rights under the loans and/or leases." *Id.* ¶ 99.

Even if true, this alleges only that American Bankers generally intended to benefit itself financially, acting "with sole objective to maximize profits," *id.* ¶ 29, not for the more specific, malicious purpose of harming Jones Realty individually. It therefore does not state a claim for tortious interference with a contract. "To subject the actor to liability under this rule, his conduct must be intended to affect the contract of a specific person." Restatement (Second) of Torts § 766 cmt. p (1979). The Complaint itself emphasizes that American Bankers entered into its "exclusive relationship" with CIT, including the agreement to pay the so-called "kickbacks," long *before* CIT ever contracted with Jones Realty. *See* ECF No. 1 ¶¶ 20-23. In allegedly agreeing to "inflate" the premium charged to CIT, the cost of which is then passed on to lessees, American Bankers could not have intended to affect the contract of any "specific person," including Jones Realty. *See Sekula v. Residential Credit Solutions, Inc.*, No. 15-2104, 2016 WL 6650712, at *4 (M.D. Fla. Nov. 10, 2016) (dismissing "kickback"-based tortious interference claim under Florida law; because the defendant-servicer placed insurance pursuant to a master policy covering the servicer's entire mortgage portfolio, the defendant-insurer "could not have known about any particular borrowers' relationships with their lenders").

Although (in Jones Realty's view) American Bankers knew that contracting to pay "kickbacks" would necessarily interfere with lessees' contractual rights, it does not follow that American Bankers acted for that particular purpose. "One does not induce another to commit a breach of contract with a third person … when he merely enters into an agreement with knowledge that the other cannot perform both it and his contract with the third person." Restatement, *supra*, § 766 cmt. n. "It is not enough that one has been prevented from obtaining performance of a contract as a result of the actor's conduct." *Id.* cmt. p; *see Franklin v. Harris*, 762 S.W.2d 847, 849 (Mo. Ct. App. 1989) (dismissing tortious interference claim because plaintiff failed to show that defendant was specifically motivated solely by malice towards the plaintiff and not by any general purpose in performing his official duties).

## B.     The Purported Interference Was Justified And Not Tortious.

"The absence of justification is an essential element of the claim for interference with contract." *Schott v. Beussink*, 950 S.W.2d 621, 628 (Mo. Ct. App. 1997). Jones Realty can neither plead nor prove this "essential element" because American Bankers had an economic interest in its preexisting "exclusive relationship" with CIT ("and/or" Avatel) and did not engage in "improper means" to further that economic interest.

"It is not justification to knowingly procure the breach of a contract where the defendant acts with an improper purpose and seeks not only to further his own interests, but in doing so employs improper means." *Cmty. Title Co. v. Roosevelt Fed. Savs. & Loan Ass'n*, 796 S.W.2d 369, 372 (Mo. 1990). "But there is no impropriety of self-interested interference when a defendant has a legitimate economic interest in the contract or expectancy." *Id.* "One who has a present existing economic interest, such as a prior contract of his own or a financial interest in the affairs of the person persuaded not to enter into a contract, is privileged to interfere with another's business expectancy to protect one's own economic interest." *Id.* "The plaintiff must plead the improper means used to induce the breach of contract." *Schott*, 950 S.W.2d at 628.[7]

American Bankers had a preexisting economic interest in complying with the master insurance policy and any other contracts governing its "exclusive relationship" with CIT. *See* ECF No. 1 ¶¶ 20-26. American Bankers' failure to pay or provide the compensation arranged for CIT under these contracts would have put it in breach or, at the very least, adversely affected American Bankers' ongoing financial interest in CIT's affairs. Given this interest, therefore,

---

[7] Missouri law and Florida law sharply conflict on this point. Whereas under Missouri law the absence of justification is an "essential element" of a tortious interference claim that the plaintiff must plead, "supported by factual allegations," in order to survive a motion to dismiss, *see Schott*, 950 S.W.2d at 628-29, under Florida law justification is a matter to be raised by the defendant as a purely "affirmative defense," and it is improper to put the plaintiff to the burden of pleading its absence in order to survive a motion to dismiss. *See Se. Integrated Med., P.L. v. N. Fla. Women's Physicians, P.A.*, 50 So. 3d 21, 24 (Fla. Dist. Ct. App. 2010). As stated in *Minnesota Mining & Manufacturing Co. v. Williamson*, "although a majority of jurisdictions take the position that a claim of absence of justification is in the nature of an affirmative defense, under Missouri law absence of justification is an element of the cause of action and is equatable with malicious interference." 675 S.W.2d 951, 957 (Mo. Ct. App. 1984). Thus, notwithstanding that, like Florida, "some jurisdictions take the position that a claim of absence of justification is in the nature of an affirmative defense, under Missouri law plaintiff has the burden of producing substantial evidence in support of this element of the cause of action." *Anderson v. Bourbeuse View, Inc.*, 726 S.W.2d 873, 875 (Mo. Ct. App. 1987).

Jones Realty bears the additional burden of showing that American Bankers employed "improper means."  "Improper means, for purposes of intentional interference with contractual relations or business expectancy, are those means which are independently wrongful, notwithstanding injury caused by the interference." *Cmty. Title*, 796 S.W.2d at 373.  "In the context of this tort," "improper means" include "threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or the common law." *Nazeri v. Mo. Valley Coll.*, 860 S.W.2d 303, 317 (Mo. 1993).  Notably, however, "protecting one's own economic interest is not an improper motive." *Cmty. Title*, 796 S.W.2d at 373.

The Complaint does not specify what, if any, "improper means" were employed.  Jones Realty apparently contends that American Bankers' payment or provision of "compensation (kickbacks, reinsurance, and low cost services)" itself constitutes the "improper means."  *See* ECF No. 1 ¶ 98.  But paying or providing CIT the compensation which CIT had contractually arranged to receive is not "independently wrongful," only the consequence of American Bankers protecting its "own economic interest" in its "exclusive relationship." *See Cmty. Title*, 796 S.W.2d at 373.  Jones Realty simply recounts purported actions taken by American Bankers that adversely affected Jones Realty, not actions separately prohibited by common law or statute.  Nor is anything that American Bankers is alleged to have done "improper" under Missouri law.  As discussed above, if CIT's receipt of undisclosed compensation, including commissions, does not constitute an illegal "kickback," American Bankers' payment or provision of the same also is not a "kickback." *See* Argument Part II.B, *supra*; *see also Cohen*, 735 F.3d at 612-13 (affirming the dismissal of a similar "kickback"-based claim for intentional interference with a contract); *Emerson Elec.*, 362 S.W.3d at 13-19.  Again, as both the Eleventh and Seventh Circuits have held, "'simply calling a commission a kickback doesn't make it one'" where, as here, there are no divided loyalties. *Feaz*, 745 F.3d at 1111 (quoting *Cohen*, 735 F.3d at 611).

**C.     The Lease Agreement Was Not Breached.**

Perhaps most fundamentally, for all the reasons set forth more fully in Argument Part II.B, *supra*, and in defendants' other motions to dismiss, the explicit and implicit terms of the Lease Agreement were never actually breached.  Absent a breach, Jones Realty's parasitic tortious interference claim cannot stand. *See Nazeri*, 860 S.W.2d at 316 (because plaintiff "does not plead any facts that would constitute a breach," she "could not state a claim for tortious interference even if she had formally pleaded all the elements of the tort").

## IV.     The Complaint Is An Egregious Example Of "Shotgun Pleading."

Finally, the Court should dismiss the Complaint if for no other reason than that it exemplifies the term "shotgun pleading."  "Shotgun pleadings" may come in many varieties. "The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests."  *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1323 (11th Cir. 2015).  Both the Eleventh Circuit and this Court have "addressed the topic of shotgun pleadings on numerous occasions in the past, often at great length and always with great dismay."  *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1296 (11th Cir. 2002); *see also Riley v. Home Retention Servs., Inc.*, No. 14-20106, 2014 WL 11906642, at *5 (S.D. Fla. June 17, 2014) (Ungaro, J.); *Kaufman v. Pfizer Pharm., Inc.*, No. 02-22692, 2010 WL 9438673, at *3-4 (S.D. Fla. Nov. 23, 2010) (Ungaro, J.).

This Complaint's sins are many.  Consider:

- It indiscriminately, repeatedly lumps all "Defendants" together, without articulating a factual basis for each defendant's liability and without considering that it is implausible that all "Defendants" should be treated as a single unit.  *See, e.g.*, ECF No. 1 ¶¶ 15, 29, 30, 33, 38, 40, 42, 46, 76, 83.  This does not satisfy even liberal federal notice-pleading standards.  *See Joseph v. Bernstein*, 612 F. App'x 551, 555 (11th Cir. 2015); *Kaufman*, 2010 WL 9438673, at *3.

- It pervasively overuses the ambiguous term "and/or," conveying the distinct impression that Jones Realty either cares little about precision or is engaged in rank speculation.  *See Joe Hand Promotions, Inc. v. Creative Entm't, LLC*, 978 F. Supp. 2d 1236, 1240 (M.D. Fla. 2013) ("The Complaint's usage of several 'and/or' conjunctions among other ambiguities, make the allegations against Defendants vague and ambiguous.").  Disturbingly, *most* sentences in the Complaint contain an "and/or."  Many sentences contain *multiple* instances of "and/or."  *See, e.g.*, ECF No. 1 ¶¶ 1, 2, 4, 8, 18, 19, 20, 22-26, 28, 37, 41, 45, 47, 57, 59-66, 70-72, 76, 77, 80, 87-94, 96-99.  "Plaintiffs in federal court are permitted to plead in the alternative, but they are not permitted to plead 'in the ambiguous.'"  *Joe Hand*, 978 F. Supp. 2d at 1240 (internal citations omitted).

- It contains numerous undifferentiated references to unspecified "affiliates."  *See, e.g.*, ECF No. 1 ¶¶ 2, 7, 12, 15, 19, 23, 24, 28, 29, 41, 45, 47, 62, 63, 72, 98.  How can Jones Realty truthfully allege that defendants' affiliates were involved in the purported "scheme" but not know any of the affiliates' names or roles?

- Its supposedly "factual" allegations are conclusory, rambling, and repetitious.  The first half of the Complaint essentially says the same thing over and over, albeit in slightly different ways, as a substitute for pleading anything of real substance.  *Compare id.* ¶¶ 1-7, *with id.* ¶¶ 18-27, *and id.* ¶¶ 28-31.

- It contains sloppy drafting.  For example, the Complaint refers to a "Florida Subclass," *see id.* ¶ 86, even though its class definitions, *see id.* ¶ 45, make no reference to a "Florida Subclass."  Among other things, this violates Local Rule 23.1(b)(2), which requires "[a]ppropriate" class definitions.  One explanation is that the Complaint recycles allegations made in other lawsuits' pleadings, but retains anachronisms.  *See also id.* ¶ 5 (referring to "the two major forced-placed insurers," an anachronism from another complaint); *id.* ¶ 50 ("Plaintiff has chosen the undersigned law firms," plural, another anachronism from another complaint).

- It contains brazen, obvious untruths, including alleging that "CIT notified Jones Real Estate Inc. **after** Plaintiff had already entered into the applicable agreement, that Plaintiff must insure the equipment against loss, damage, destruction and theft for its replacement cost, naming CIT as loss payee," *see id.* ¶ 35 (emphasis in original), when, in fact, Section 6 of the signed, written Lease Agreement states that "You [Jones Realty] will provide and maintain at your expense … property insurance against the loss, theft or destruction of, or damage to, the Equipment for its full replacement value, naming us [CIT] as loss payee."  The Complaint also refers to CIT Group, Inc.'s "principal place of business in Livingston, New York," *id.* ¶ 11, when it should refer to Livingston, New Jersey (Jones Realty might have investigated the matter at https://www.cit.com/contact/).

- It contradicts itself.  For example, the Complaint simultaneously refers to American Bankers as a "division" of Assurant, Inc., *see id.* ¶ 12, and also as Assurant's, Inc.'s "subsidiary," *see id.* ¶ 10, as though there were not a critical factual and legal difference between these two terms.  *See Matter of Chrome Plate, Inc.*, 614 F.2d 990, 996 (5th Cir. 1980) (explaining that "a division of a corporation is not a separate legal entity, apart from the corporation, but a subsidiary corporation is separate").  Or, for another example, the Complaint states at one point that American Bankers "underwrites the force-placed insurance at issue," ECF No. 1 ¶ 10, but later suggests that *both* Assurant, Inc. *and* American Bankers "provide force-placed insurance" to CIT.  *Id.* ¶ 28.

- It neither quotes the relevant terms of, nor attaches as an exhibit, the Lease Agreement, although Jones Realty's claims for relief are all explicitly premised upon that Agreement.  Even under liberal federal notice-pleading standards, a "failure to attach the actual contract coupled with a failure to cite to specific language doom[s]" contract-based claims.  *Herssein Law Group v. Reed Elsevier, Inc.*, 594 F. App'x 606, 608 (11th Cir. 2015).

A proper remedy for a "shotgun pleading" is its dismissal for failure to state a claim upon which relief can be granted.  *See Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1126 (11th Cir. 2014).  Accordingly, in "the interest of justice and in fairness to Defendants," the Court should "dismiss the Complaint with instructions for Plaintiff to replead all claims not [otherwise] dismissed" so that "Defendants will thereafter have an opportunity to challenge the substance of those claims with the benefit of a coherent Complaint."  *Riley*, 2014 WL 11906642, at *5.

**CONCLUSION**

The Court should dismiss with prejudice Counts III and V from the Complaint.

Dated:  November 27, 2017                    Respectfully submitted,

                                             CARLTON FIELDS JORDEN BURT, P.A.

                                             By: */s/ Irma Reboso Solares*
                                             Irma Reboso Solares (Fla. Bar No. 797073)
                                             isolares@carltonfields.com
                                             100 S.E. Second Street
                                             Miami Tower, Suite 4200
                                             Miami, Florida 33131
                                             Telephone: (305) 530-0050
                                             Facsimile: (305) 530-0055

                                             Frank G. Burt (Fla. Bar No. 197963)
                                             fburt@carltonfields.com
                                             1025 Thomas Jefferson Street, NW
                                             Suite 400 West
                                             Washington, DC 20007
                                             Telephone: (202) 965-8100
                                             Facsimile: (202) 965-8104

                                             *Attorneys for Defendants Assurant, Inc. and*
                                             *American Bankers Insurance Company of Florida*

**CERTIFICATE OF SERVICE**

  I hereby certify that a true and correct copy of the foregoing Motion to Dismiss Counts III and V of the Class Action Complaint was filed on November 27, 2017, with the Clerk by using the CM/ECF system, which system served all counsel of record.

*/s/ Irma Reboso Solares*
Irma Reboso Solares

21