UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
JONES REAL ESTATE, INC. d/b/a
JONES REALTY, individually and on
behalf of all others similarly situated,

                      Plaintiffs,                  18-cv-1949 (PKC)

       -against-                   OPINION
                                         AND ORDER

AVATEL TECHNOLOGIES, INC., THE CIT
GROUP INC., and CIT BANK, N.A.,

                      Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

        Plaintiff Jones Real Estate, Inc. ("Jones") filed its Second Amended Class Action Complaint (the "SAC") against Defendants Avatel Technologies, Inc. ("Avatel"), CIT Group, Inc. ("CIT Group"), and CIT Bank, N.A. ("CIT Bank") alleging seven causes of action for breach of contract (Counts I and IV), breach of implied covenant of good faith and fair dealing (Counts II and V), a violation of New York General Business Law § 349 (Count VI), and violations of the Florida Deceptive and Unfair Trade Practices Act (Counts VII and VIII).[1] Defendants have moved, pursuant to Rule 12(b)(6), Fed. R. Civ. P., to dismiss the Complaint for failure to state a claim upon which relief may be granted.

        Plaintiff has withdrawn Counts IV and V, which deal with an alleged "negative option contract." (Pl. Brief at 1 n.2). Accordingly, this Court dismisses Counts IV and V. For reasons that will be explained, the Court will deny defendants' motions to dismiss with respect to

---

[1] Plaintiff has omitted a "Count III" from its Complaint. The Court will refer to the Counts as they are enumerated in the Complaint.

Count I, as asserted against CIT Bank only, and grant the motions with respect to the remaining claims against all defendants.

BACKGROUND

The following facts are drawn from Jones's Second Amended Complaint as well as from the materials attached to, and incorporated by reference into the pleading. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002). For the purposes of defendants' motions, all non-conclusory factual allegations in Jones's Second Amended Complaint are accepted as true, and all reasonable inferences are drawn in favor of Jones as the non-movant. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007).

Jones brings this case as a putative class action on behalf of all others similarly situated, namely customers of CIT Group, CIT Bank, and Avatel. (SAC ¶ 49). Subject matter jurisdiction is premised on the Class Action Fairness Act. (SAC ¶ 15). All of the wrongdoing alleged by Jones stems from activities that occurred in Florida. (SAC ¶ 13). Jones is a corporation organized under the laws of the state of Missouri; for certain purposes it is a "pass through" corporation. (SAC ¶¶ 8, 9). Avatel is a supplier of office equipment, including voice, data, and video equipment. (SAC ¶¶ 1, 10). CIT Group is a financial holding company that provides financing, leasing, and advisory services to small businesses and middle market companies. (SAC ¶ 11). CIT Bank is an FDIC insured bank that is a subsidiary of CIT Group. (SAC ¶¶ 11, 12).

The Lease Agreement between Jones and CIT Bank

Jones entered into a lease agreement with CIT Bank to lease telephone equipment supplied by Avatel (the "Lease"). (See SAC, Ex. 2). The Lease identifies the Lessor as "CIT

Bank, N.A." and the Lessee as Jones. (SAC ¶ 12, Ex. 2 at 1). The equipment that Jones leased would have cost approximately $644.00 if Jones had purchased the equipment instead of leasing it. (SAC ¶ 5). The Lease required Jones to use the equipment "only for business purposes . . . ." (SAC, Ex. 2 at ¶ 1).

The Lease also required Jones to obtain insurance related to the leased equipment. (SAC, Ex. 2 at ¶ 6). In the event, Jones failed to provide proof of acceptable insurance, CIT Bank had the right (but not the obligation) to obtain insurance and the full costs of obtaining that insurance may be added to the charges to be paid by Jones under the Lease. (SAC ¶ 4, Ex. 2 at ¶ 6). The present motion requires a construction of this provision of the Lease, which will be deferred to the section analyzing Jones's breach of contract claim.

It suffices to note that Jones did not obtain or provide any proof of insurance to CIT Bank. (SAC ¶ 36). As a result, CIT Bank obtained $10,235.00 in insurance coverage, which is $0.61 less than the amount that Jones would be expected to pay to CIT Bank over the course of the Lease. (SAC ¶¶ 5, 39). CIT Bank charged the premiums for this insurance policy directly to Jones by adding $19.58 to Jones's monthly Lease invoices. (SAC ¶¶ 20, 40).

Jones voices a variety of complaints about the $19.58 per month charge. In Counts I and II it asserts breach of contract and breach of the implied covenant of good faith and fair dealing claims against CIT Bank, arguing that the additional insurance charge was inflated because CIT Bank obtained insurance for a value higher than the Lease allowed. Jones also claims in Count VI that CIT Bank and CIT Group did not adequately disclose what Jones would be charged for insurance in violation of N.Y. Gen. Bus. L. § 349(a). In Count VII, it asserts a violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §

501.201 et seq., against CIT Group for, among other things, charging inflated premiums for the insurance and related misrepresentations.

Avatel's Service Protection Plan and the Equipment Warranty

Apart from the insurance provision of the Lease between Jones and CIT Bank, Jones complains about a Service Protection Plan (the "SPP") offered by defendant Avatel. In Count VIII (against CIT Group and Avatel), Jones alleges violations of FDUTPA, Fla. Stat. § 501.201 et seq., based on the marketing of the SPP. It asserts, among other things, that the SPP does not become effective until the manufacturer's warranty expires and that the SPP overlaps with protections offered by the warranty.

The telephone equipment leased by Jones comes with a manufacturer's warranty (the "Warranty"), which covers hardware for twelve months, and software for ninety days. (Def. Avatel's Br., Ex. 1 at 1). With regard to maintenance requests, the warranty provides that "[i]f a Product is not in conformance with the warranty above and [the manufacturer] receives a written notice during the applicable warranty period describing in reasonable detail how the Product failed to be in conformance, and including evidence that the product is under warranty . . . , [the manufacturer] at its option will: (i) repair or replace the Product to achieve conformance and return the Product; or (ii) refund the applicable fees upon return of the non-conforming Product to [the manufacturer]." (Id.)

The SPP provides benefits to those who lease or purchase office equipment from Avatel. (See SAC, Ex. 3). Pursuant to the SPP, a customer is entitled to services and assistance related to software and hardware failures to be provided by Avatel within certain designated response times. (SAC, Ex. 3 at 4). The SPP's coverage includes "remote telephone support, remote diagnostics, troubleshooting, problem resolution, software maintenance updates/fixes, on-

site parts replacement, and any on-site support Avatel deems necessary to resolve a fault." (SAC, Ex. 3 at 3). Where "an issue cannot be resolved remotely, and Avatel determines on-site intervention is required to do so," the SPP "provides the dispatch of Avatel's field technical resources . . . including engineering support." (Id.). The SPP also "provides for on-site replacement of any covered [hardware] part Avatel determines to be defective" and states that "[d]efective software media will be replaced at no charge." (Id.). The SPP also describes what "Response Intervals" Avatel will comply with when responding to requests for maintenance support. (SAC, Ex. 3 at 4). Depending on the nature of the maintenance request, the response times range from two business hours to two business days. (Id.).

In the "TERMS AND CONDITIONS" section of the SPP, the SPP states "[Avatel] and you, the customer, agree that the following terms and conditions will apply to post warranty maintenance (Services) listed on the attached agreement." (SAC, Ex. 3 at 5). Under the heading "Contract Period," the SPP states that "This agreement shall be effective when signed by you, accepted in writing by Avatel and existing products are certified and deemed in working condition and will remain in effect until terminated as set forth in the Termination Section of this agreement." (Id.). Under the "Coverage" heading, the SPP states "Avatel shall, during the contracted period, furnish all parts and service necessary to maintain the System in good working order[,] . . . dispatch service personnel to the Premises to perform necessary repairs, . . . [and] conduct remote diagnostic testing, when applicable." (Id.). On the signature page, underneath an itemized list of equipment that Jones selected, the SPP states in bold print that "Coverage period begins after Installation and product registration and runs concurrent with the term of the original lease." (SAC, Ex. 3 at 2). Below this representation, the SPP states "The

Protection Plan will commence upon execution of the agreement between both parties, certification and receipt of payment agreed upon." (Id.).

LEGAL STANDARD

Rule 12(b)(6) requires a complaint to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." Id.

In assessing the sufficiency of a pleading, a court must disregard legal conclusions, which are not entitled to the presumption of truth. Id. Instead, the Court must examine the well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief." Id. at 679. "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'" Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 208-09 (2d Cir. 2014) (quoting Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)).

DISCUSSION

I. The Breach of Contract Claim Against CIT Bank (Count I)

Jones alleges that CIT Bank breached the Lease Agreement by "force placing insurance in an amount that exceeds the value of the equipment and charging Plaintiff the inflated premiums that are based on the value of the lease" and by "charging borrowers for force-placed insurance premiums that are not reasonable or appropriate to protect the note-holder's

interest in the equipment and rights under the security instrument."[2] (SAC ¶¶ 69, 70). Under New York law,[3] a complaint stating a breach of contract claim must allege (1) the existence of a contract; (2) performance of the contract by one party; (3) breach of the contract by the other party; and (4) damages. Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996).

To determine whether there has been a breach, the Court begins with the obligation on the part of Jones to obtain insurance:

> You will provide and maintain at your expense (a) property insurance against the loss, theft or destruction of, or damage to, the Equipment for its full replacement value, naming us as loss payee, and (b) public liability and third party property insurance, naming us as an additional insured. You will give us certificates or other evidence of such insurance when requested. Such insurance will be in a form, amount and with companies acceptable to us . . . .

(SAC, Ex. 2 at ¶ 6.)

The plain language places an unconditional obligation to obtain the insurance on Jones. The capitalized term "Equipment" refers to "equipment, maintenance and services," which Jones must insure at "its full replacement value." (SAC, Ex 2 at ¶¶ 1, 6.) The required insurance must necessarily encompass more than just the tangible items leased to Jones.[4] Indeed, the insurance must also cover liability to third parties (naming CIT Bank as additional insured), which might arise from, for example, a fire caused by the telephone equipment. (Id.).

---

[2] The terms "force placing" or "forced-placed" are apparently pejorative characterizations applied by Jones to the Lease provision requiring the lessee carry certain insurance, or, if the lessee does not comply, granting the lessor the option to purchase insurance and pass the cost onto the lessee. These characterizations add nothing to Jones's arguments. By the same logic, the requirement that the lessee make a monthly payment for the property it leased could be characterized as "forced lease payments."

[3] The Lease, which is the subject of Counts I and II, states that "this lease and any claims, controversies, disputes or causes of action (whether in contract, tort or otherwise) shall be governed, construed, and enforced in accordance with Federal law and the laws of the State of New York (without regard to the conflict of laws principles of such state)." (SAC, Ex. 2 at 1). The parties agree that New York law governs.

[4] The Court will refer to the tangible items leased to Jones as the lower-case term "equipment."

The insurance must be in a "form, amount, and with companies acceptable to [CIT Bank] . . . ." (Id.).[5]

As will be seen, the permissive option granted to CIT Bank in the event that Jones failed to obtain the required insurance is not on its face symmetrical with the insurance Jones was required to obtain. Paragraph 6 of the Lease continues as follows:

> If you do not give us evidence of insurance acceptable to us, we have the right, but not the obligation, to obtain insurance covering our interest in the Equipment for the term of this Lease, including any renewals or extensions, from an insurer of our choice, including an insurer that is our affiliate. We may add the costs of acquiring and maintaining such insurance and our fees for our services in placing and maintaining such insurance (collectively, "Insurance Charge") to the amounts due from you under this Lease. You will pay the Insurance Charge in equal installments allocated to the remaining Lease Payments.

(SAC ¶ 4, Ex. 2 at ¶ 6.)

In order to determine whether CIT Bank overcharged Jones by charging it for insurance that covered the stream of payments to CIT Bank over the life of the Lease, it is necessary to construe a key phrase in the above-quoted language: "obtain insurance covering our [i.e., CIT Bank's] interest in the Equipment for the term of this Lease . . . ." One construction is that "our interest in the Equipment for the term of this Lease" refers to the payments to be made by Jones to CIT Bank over the term of the Lease, plus any residual value of the equipment. If that is the proper construction, then there likely would be no breach because CIT Bank obtained insurance for $0.61 less than the expected payments over the life of the Lease. An alternate construction is that the reference to "our interest in the Equipment" means the value of the

---

[5] While CIT Bank makes something of the fact that the Lease grants it authority to determine whether the "amount" of insurance obtained by Jones is acceptable, its argument that this language grants it authority to place insurance based on the value of the Lease fails for two reasons: (1) that language must be read in conjunction with the provision setting forth the insurance coverage Jones must obtain; and (2) there is no dispute that Jones obtained no coverage and hence the language has no application to the present controversy relating to insurance obtained by CIT Bank.

- 8 -

equipment and the costs of maintaining and repairing the equipment over the life of the Lease, an amount likely to be considerably smaller than $10,235.00 given that the alleged original outright cost of the equipment of $644.00. (SAC ¶ 5).

"At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract [insofar as they are material to the dispute] are unambiguous." Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp., 830 F.3d 152, 156 (2d Cir. 2016). "A contract is unambiguous . . . if 'the contract language has a definite and precise meaning . . . and concerning which there is no reasonable basis for a difference of opinion.'" Id. (quoting Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., 773 F.3d 110, 114 (2d Cir. 2014)). On the other hand, "ambiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC, 692 F.3d 42, 53 (2d Cir. 2012) (citation omitted). "Whether a contract is ambiguous is a question of law for the court to decide." Id. (citation omitted).

The state of the briefing by the parties on the proper construction of the terms of the Lease leaves the Court with the preliminary conclusion that the language is ambiguous and susceptible to more than one plausible interpretation. For this reason the motion to dismiss will be denied as to so much of the breach of contract claim as alleges that Jones was charged premiums in excess of the amount allowed by the Lease. The issue, of course, may be revisited at the summary judgment stage.

To the extent Jones seeks to recover on the more generalized assertion that "CIT Bank, N.A. has further breached the terms of the Lease Agreement by charging borrowers for force-placed insurance premiums that are not reasonable or appropriate to protect the note-holder's interest in the equipment and rights under the security instrument," (SAC ¶ 70), it cites no law for the proposition that the provision of the Lease is unlawful or otherwise violates any public policy of the state of New York. If Jones means nothing more than the premiums were not "appropriate" because they were not authorized by the Lease, then similarly (and subject to the same considerations on contract construction) the allegation states a claim.

II. The Breach of Implied Covenant of Good Faith and Fair Dealing Claim Against CIT Bank (Count II)

In New York, all contracts contain an implied "covenant of good faith and fair dealing in the course of contract performance." Dalton v. Educ. Testing Serv., 663 N.E.2d 289, 291 (N.Y. 1995). Included within the covenant of good faith and fair dealing are "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." Id. (citation omitted). One of these promises is that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Id. "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." Id.

New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." Harris v. Provident Life & Acc. Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002). "A party may maintain a claim for breach of the implied covenant only if the claim is based on allegations different from the allegations underlying the accompanying breach of

contract claim." Fleisher v. Phoenix Life Ins. Co., 858 F. Supp. 2d 290, 298–99 (S.D.N.Y. 2012). A claim for breach of the implied covenant based on the same underlying allegations "will be dismissed as redundant." Id.; Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce, 894 N.Y.S.2d 47, 49–50 (N.Y. 2010) (holding that a breach of implied covenant claim was "duplicative of the breach-of-contract claim [because] both claims arise from the same facts . . . and seek the identical damages").

Jones alleges that CIT Bank breached the implied covenant of good faith and fair dealing by "[f]orce placing insurance coverage in excess of that required to cover the lender's and/or lessor's interest in the equipment (i.e., more than the value of $644)[,] . . . [and] [f]orce placing insurance coverage in the amount of the Lease ($10,235)." (SAC ¶ 78). Jones alleges that, as a result, plaintiff and the putative class "suffered damages" and requests "compensatory damages resulting from [CIT Banks's] breaches of their duties." (SAC ¶ 79). On Jones's breach of contract claim, Jones similarly alleged that CIT Bank breached the Lease Agreement by "force placing insurance in an amount that exceeds the value of the equipment and charging Plaintiff the inflated premiums that are based on the value of the lease," and that Jones and the putative class "suffered damages as a result of [CIT Bank's] breaches of contract." (SAC ¶ 69-71). As damages for the breach of contract claim, Jones requested "compensatory damages resulting from [CIT Bank's] breach of contract." (SAC ¶ 71). Because Jones's breach of implied covenant claim is based upon the same set of facts underlying the breach of contract claim and seeks the same damages, the breach of implied covenant claim is dismissed.

III.    The NY GBL § 349 Claim Against CIT Group "or" CIT Bank (Count VI)

Jones brings a claim (Count VI) under New York's statutory prohibition on "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the

- 11 -

furnishing of any service" in the state of New York. N.Y. Gen. Bus. Law § 349(a). The statute provides a private right of action to "any person who has been injured by reason of any violation of [section 394]." Id. § 349(h). Because New York requires a showing that defendants' conduct was "consumer oriented," Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 64 (2d Cir. 2010), and defendants maintain that their conduct was not, CIT Bank and CIT Group move to dismiss the claim.

Jones's claim relates to defendants' conduct in relation to the Lease, which expressly required Jones to use the equipment "only for business purposes . . . ." (SAC, Ex. 2 at ¶ 1). Jones is a "corporation organized under the laws of Missouri." (SAC ¶ 8). Jones does not allege that the defendants entered into similar lease agreements for office equipment with any person or entity that qualifies as a "consumer." Indeed, according to the Second Amended Complaint, the target market of CIT Group and CIT Bank are businesses. (SAC ¶ 11) (CIT Group "develops business solutions for small business and middle market companies for the acquisition of equipment and value-added services").

Conduct is "consumer-oriented" under section 349 only if it has "a broader impact on consumers at large." Id. "[P]rivate contract disputes between the parties do not fall within the ambit of the statute." Id. (quotation marks omitted) (citing Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 25 (N.Y. 1995)). In this context, consumers are "those who purchase goods and services for personal, family or household use." Shema Kolainu-Hear Our Voices v. ProviderSoft, LLC, 832 F. Supp. 2d 194, 204 (E.D.N.Y. 2010) (quoting Sheth v. N.Y. Life Ins. Co., 709 N.Y.S.2d 74, 75 (1st Dep't 2000)). "The 'consumer oriented' requirement does not preclude businesses from acting as plaintiffs in lawsuits pursuant to Section 349." Statler v. Dell, Inc., 775 F. Supp. 2d 474, 484 (E.D.N.Y.

2011). However, "[b]ecause section 349 is fundamentally a consumer protection statute, contractual disputes between businesses are not encompassed within section 349." Int'l Design Concepts, LLC v. Saks Inc., 486 F. Supp. 2d 229, 239 (S.D.N.Y. 2007) (citing Oswego, 85 N.Y.2d at 25).

"[W]hen the activity complained of involves the sale of commodities to business entities only, such that it does not directly impact consumers, section 349 is inapplicable." ProviderSoft, 832 F. Supp. 2d at 204 (collecting cases and holding that plaintiff inadequately alleged "consumer-oriented" conduct where the defendant sold software specifically designed for businesses and there was "virtually no chance" that the software would be marketed to or used by consumers); Cruz v. NYNEX Info. Res., 703 N.Y.S.2d 103, 107 (1st Dep't 2000) (holding same where defendants sold "advertisement space in the Yellow Pages," which is "by definition, a commodity available to businesses only").

Jones asserts that defendants' conduct impacts consumers because Jones is a "pass-through" corporation—presumably referring to its tax treatment—and, as such, any losses that Jones suffers affects "what the consumer individual owners of Jones Realty can buy as consumers." (SAC ¶ 120). This fact does not save Jones's claim because to conclude that a transaction between two corporate entities is "consumer-oriented" merely because the entities are owned by individuals would "obliterate the distinction at the root of [section 349]." See USAlliance Fed. Credit Union v. CUMIS Ins. Soc., Inc., 346 F. Supp. 2d 468, 473 (S.D.N.Y. 2004) (holding that consumer-oriented conduct could not arise from the fact that plaintiff was a credit union consisting of "nothing but the savings of its members" because "[c]oncluding otherwise would imply that any transaction between an insurer and a publicly traded company was consumer oriented simply because the company was owned by dispersed shareholders").

Jones's section 349 claim will be dismissed with respect to both CIT Group and CIT Bank because Jones has not adequately alleged that the defendants' conduct was "consumer-oriented" within the meaning of section 349. Count VI will be dismissed.

IV.  The Florida Deceptive and Unfair Trade Practices Act Claims

Section 501.204 of FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. Ann. § 501.202. FDUTPA is to be "construed liberally" to "protect the consuming public and legitimate business enterprises." Id.

To make out a claim for damages under FDUTPA, a plaintiff must establish three elements: "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." Rollins, Inc. v. Butland, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006). A deceptive act "is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." Zlotnick v. Premier Sales Grp., Inc., 480 F.3d 1281, 1284 (11th Cir. 2007) (citing PNR, Inc. v. Beacon Prop. Mgmt., Inc., 842 So.2d 773, 777 (Fla. 2003)). "This standard requires a showing of 'probable, not possible, deception' that is 'likely to cause injury to a reasonable relying consumer.'" Zlotnick, 480 F.3d at 1284 (citing Millennium Commc'ns & Fulfillment, Inc. v. Office of the Att'y Gen., 761 So.2d 1256, 1263 (Fla. Dist. Ct. App. 2000)). For an act to qualify as an unfair practice, "the injury to the consumer: (1) must be substantial; (2) must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and (3) must be an injury that consumers themselves could not reasonably have avoided." Martorella v. Deutsche Bank Nat'l Tr. Co., No. 12-80372-CIV, 2015 WL 11347664, at *5 (S.D. Fla. Aug. 6, 2015) (citing Porsche Cars N. Am., Inc. v. Diamond, 140 So. 3d 1090, 1096 (Fla. Dist. Ct. App. 2014)).

### i. FDUTPA Claim Against CIT Group (Count VII)

Jones alleges in Count VII that CIT Group violated FDUTPA because it "failed to disclose that the negative option insurance policy it would place on behalf of the Plaintiff and the Class Member's coverage exceeded the value of the equipment—essentially in an amount equal to the cost of the Lease" and "misrepresented that the negative option insurance that would be placed on behalf of the Plaintiff and Class Members was an insurance policy with coverage that was in the value of the equipment." (SAC ¶ 134). CIT Group moved to dismiss this claim on the ground that Jones has failed to allege a deceptive or unfair practice on the part of CIT Group. Jones does not address this argument in its response to CIT Group's motion to dismiss. (See Doc. 100).

A court "may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." Felix v. City of New York, 344 F. Supp. 3d 644, 654 (S.D.N.Y. 2018) (citing Arma v. Buyseasons, Inc., 591 F. Supp. 2d 637, 643 (S.D.N.Y. 2008)); see also, Jackson v. Fed. Exp., 766 F.3d 189, 196 (2d Cir. 2014) ("Where abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended."); Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC, No. 08-CV-442 (TPG) (FM), 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014) ("At the motion to dismiss stage, where review is limited to the pleadings, a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim."); Sullivan v. City of New York, No. 14-CV-1334 (JMF), 2015 WL 5025296, at *4 (S.D.N.Y. Aug. 25, 2015), aff'd, 690 F. App'x 63 (2d Cir. 2017) ("[A court] could properly deem a represented party to have abandoned claims if, in opposing a motion to dismiss multiple claims, it addressed only some of them.").

Here, Jones's failure to respond to CIT Group's motion to dismiss with respect to Count VII, while responding to CIT Group, CIT Bank, and Avatel's motions to dismiss with respect to all other claims suggests that Jones intended to abandon Count VII. Jones's intent to abandon this claim is further supplemented by Jones's abandonment of all other claims relating to the alleged "negative option contract," i.e., Counts IV and V. (See Pl. Brief at 1 n.2). Accordingly, the Court concludes that Jones has abandoned Count VII and dismisses that claim.

ii. FDUTPA Claim Against CIT Group and Avatel (Count VIII)

In Count VIII, Jones alleges that Avatel and CIT Group engaged in a deceptive or unfair practice in violation of FDUTPA by "representing that the [SPP] 'will commence upon execution of the agreement between both parties, certification and receipt of payment agreed upon,'" and "omitting the material fact that benefits will not be provided under the plan until after the warranty period [for the telephone equipment]." (SAC ¶ 147). Jones also alleges that the SPP "had no value because that which the plan purportedly covers is already covered by the Warranty." (SAC ¶ 28). Avatel maintains that the SPP provides more benefits than the Warranty and that SPP benefits are fully available during the Warranty period.

Regarding Jones's allegation that the SPP has "no value" because it provides the same benefits as the Warranty, Jones's allegation is not plausible because it is contradicted by the contents of the SPP and the Warranty.[6] (See SAC, Ex. 3; Def. Avatel's Br., Ex. 1). Upon comparing these two documents, it is apparent that the SPP provides more benefits than the

---

[6] Though the Warranty is attached to defendant Avatel's motion to dismiss and not attached to the Complaint, the Court considers it on defendants' motions to dismiss because Jones references it throughout the Complaint and the terms and effect of the Warranty are integral to Jones's claim under Count VIII. See Vaher v. Town of Orangetown, N.Y., 916 F. Supp. 2d 404, 423–24 (S.D.N.Y. 2013) ("The Court . . . may consider a document that is attached to the complaint, incorporated by reference or integral to the complaint, provided there is no dispute regarding its authenticity, accuracy or relevance.").

Warranty. For instance, the SPP covers both software and hardware while in effect, whereas the Warranty covers hardware for twelve months and software for only ninety days. (SAC, Ex. 3 at 4; Def. Avatel's Br., Ex. 1 at 1). Moreover, the SPP provides for on-site repairs and designates time intervals within which customers can expect a remote response from technicians, an on-site repair visit, or a replacement part delivery. (SAC, Ex. 3 at 3). The warranty offers no such services or guarantees.

Jones's allegation that the SPP does not require Avatel or CIT Group to provide benefits to Jones until after the Warranty expires is also not plausible. Jones does not allege that it ever sought to obtain benefits under the SPP while the Warranty was in effect, nor does it allege that Avatel or CIT Group ever denied benefits to Jones under the SPP during the Warranty period. Jones's allegation of a deceptive or unfair practice rests solely on language found in the SPP itself, which states under the "TERMS AND CONDITIONS" section, "[Avatel] and you, the customer, agree that the following terms and conditions will apply to post warranty maintenance (Services) listed on the attached agreement." (SAC ¶¶ 27, 42, Ex. 3 at 5).

However, the SPP states in numerous locations that the SPP becomes effective when the equipment is installed and certified and the SPP is signed and accepted. For instance, in the same "TERMS AND CONDITIONS" section under the heading "Contract Period," the SPP states that "[t]his agreement shall be effective when signed by you, accepted in writing by Avatel and existing products are certified and deemed in working condition." (Id.). In the same section, under the "Coverage" heading, the SPP states "Avatel shall, <u>during the contracted period</u>, furnish all parts and service necessary to maintain the System in good working order[,] . . . dispatch service personnel to the Premises to perform necessary repairs, [and] . . . conduct remote diagnostic testing, when applicable." (Id. (emphasis added)). Moreover, on the signature

page, the SPP states in bold print that "Coverage period begins after Installation and product registration and runs concurrent with the term of the original lease." (SAC, Ex. 3 at 2). Also on the signature page, the SPP states "The Protection Plan will commence upon execution of the agreement between both parties, certification and receipt of payment agreed upon." (Id.).

It is apparent from the language of the SPP that SPP benefits are available throughout the "Contract Period," which commences when the SPP is signed by both parties, payment is conferred, and the leased office equipment is installed and certified, not when the Warranty on the equipment expires. In context, the language "the following terms and conditions will apply to post warranty maintenance (Services)" appears to be an explicit representation that the SPP provides benefits past the Warranty expiration date, rather than a limitation of SPP benefits to after the Warranty period. Therefore, "without some further factual enhancement," such as an allegation that Avatel or CIT Group denied benefits to Jones during the Warranty period, Jones's allegation that SPP benefits are not available until after the Warranty expires "stops short of the line between possibility and plausibility of entitle[ment] to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007) (internal quotation marks omitted). Jones therefore has not adequately allege a violation of FDUTPA by Avatel or CIT Group. The Court accordingly dismisses Count VIII.

CONCLUSION

The motions to dismiss are DENIED with respect to Count I (as asserted against CIT Bank) and GRANTED with respect to the remaining claims and parties, including all claims against CIT Group and Avatel. The Clerk is respectfully directed to terminate the motions (Docs. 55, 94, 96).

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       March 12, 2019